UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                )
SUZANNA E. BLACKETTE,           )
                                )
            Plaintiff,          )
                                )    CIVIL ACTION
        v.                      )    NO. 1:13-cv-11546-WGY
                                )
CAROLYN W. COLVIN, Acting       )
Commissioner of Social Security,)
                                )
            Defendant.          )
_____)

YOUNG, D.J.                                   September 25, 2014

<u>MEMORANDUM AND ORDER</u>

## I.   INTRODUCTION

In this action, Suzanna E. Blackette ("Blackette") appeals
the decision of the Social Security Commissioner (the
"Commissioner" or the "Agency") denying her application for
Social Security Disability and Supplemental Security Income
benefits.  This Court has jurisdiction pursuant to 42 U.S.C.
section 405(g).  Blackette challenges the determination of the
presiding Administrative Law Judge (the "hearing officer") that
she was not disabled within the meaning of the relevant
statutory provisions.

### A.   Procedural Posture

In early 2009, Blackette filed two applications for
benefits under the Social Security Act: the first, on February

19, 2009, for disability insurance benefits under Title II, and the second, on March 10, 2009, for supplementary security income under Title XVI. Administrative R. ("Admin. R.") 80, 1195.[1] The claims were initially denied in late 2009, see id. at 34, 1205, and were then denied a second time in 2010 after a motion for reconsideration, see id. at 17. Blackette requested a hearing on July 14, 2011, id. at 42, which was conducted on August 21, 2012, id. at 17. The hearing officer concluded that Blackette was not disabled in a written decision issued on September 10, 2012. Id. at 17, 31. Blackette administratively appealed her case to the Agency's Appeals Council, which denied her appeal in May 2013. Id. at 10.

Accordingly, on June 28, 2013, Blackette timely filed this appeal in federal district court. See Compl., ECF No. 1. On October 9, 2013, after the administrative record was produced, she moved to remand this case to the Agency. Pl.'s Mot. Remand Decision Acting Comm'r Social Sec. Admin., ECF No. 13; Pl.'s Am. Mem. Law Supp. Mot. Remand Decision Acting Comm'r Social Sec. Admin. ("Pl.'s Mem."), ECF No. 18. The Agency, in turn, moved for an order affirming the decision of the Commissioner on February 24, 2014. Def.'s Mot. Order Affirming Decision Comm'r, ECF No. 25; Mem. Law Supp. Mot. Order Affirming Comm'r's

---

[1] The Administrative Record was provided under seal to this Court. See ECF No. 11.

Decision ("Def.'s Mem."), ECF No. 26.  Blackette replied on
March 4, 2014.  Reply Mem. ("Pl.'s Reply"), ECF No. 27.

**B.    Facts and Medical History**

The relevant factual history is briefly described here.  In
order to preserve the privacy of the parties involved, facts not
necessary to this Court's decision, though they were considered,
are not discussed in this opinion.

**1.    Accident and Immediate Post-Accident
Hospitalization**

On December 31, 2004, Blackette, then nineteen years old,
was involved in a high-speed car accident.  Admin. R. 572.  She
was brought to the University of Massachusetts ("UMass") Medical
Center's emergency room, where she was diagnosed with a skull
fracture and brain hemorrhaging.  See id.  She underwent
extensive treatment over the next six weeks, including surgery
to repair her skull fracture.  Id.  On February 15, 2005, she
was discharged from UMass and admitted to Spaulding
Rehabilitation Hospital.  Id. at 209.  On admission to
Spaulding, she was "aware and alert," although she was "unable
to know the President, [and] could not name month or date."  Id.
After beginning rehabilitation activities, however, "she made
consistent excellent gains with respect to agitation, cognition,
and orientation."  Id. at 210.  She was discharged on March 3,
2005, and she returned home, where she was placed under 24-hour

3

supervision.  Id. at 212.  Upon discharge, her treating

physician, Dr. Heechin Chae, M.D., reported that a

"[n]europsychology evaluation shows significant frontal lobe

syndrome, mostly with slowness of processing speech and memory

difficulty with difficulty of arithmetic solution.  The patient

is an excellent candidate to continue to improve."  Id.

Over the next several years, Blackette underwent a series

of medical treatments and evaluations.

## 2.  Dr. Neiman Evaluation (April & May 2005)

Early in her rehabilitation, Blackette was examined on

April 5, 2005, and again on May 3, 2005, by Dr. Beth Neiman,

Ph.D., a consulting neuropsychologist.  Id. at 310.  Dr. Neiman

reported that Blackette's "language was generally fluent," and

she "worked for two hours without asking for or accepting the

evaluator's offer to take a break."  Id. at 311.  She did note

that Blackette's mother had reported that her daughter

"currently demonstrates memory difficulties."  Id. at 310.  Dr.

Neiman then summarized the results of her testing as follows:

> Evaluation results shows [Blackette] to be
> demonstrating a profile of intact skills on tasks of
> visual conceptual problem solving, visual abstract
> reasoning, and executive functioning.  She
> demonstrates evidence of significant cognitive slowing
> on tasks of mental control and sustained attention.
> She demonstrates functional skills on tasks of
> immediate auditory recall, delayed auditory memory,
> auditory recognition, and visual motor integration,
> with significantly impaired visual recall and delayed

visual memory.  She demonstrates moderately to
severely impaired verbal fluency skills.

Results suggest that [Blackette] is at risk to
experience episodes of mental fatigue and cognitive
confusion when attempting complex cognitive tasks,
given the slowing of her information processing speed
and the intensity of attention necessary to achieve a
high level of success.

Id. at 313-14.  She then recommended "extensive educational

support[] to achieve academic success," as well as speech,

language, and cognitive rehabilitation therapy.  Id. at 314.

### 3.    Dr. Swearer Evaluation (November 2007)

Blackette's next evaluation was conducted on November 13,

2007, by Dr. Joan M. Swearer, Ph.D., a neuropsychologist.  Id.

at 770, 776.  Dr. Swearer summarized her test results by

concluding that:

[Blackette]'s general intellectual abilities were
estimated to be in the average range.  Verbal and non-
verbal abilities were at similar functional levels,
but with significant scatter among subtest scores
(e.g., high average vocabulary versus low average
immediate memory span).  Her memory and ability to
learn new information were variable with average
recall and retention of prose material.  Immediate
recall of a supraspan word list after 5 learning
trials was within normal limits, however, an
interference list had a significant negative impact on
immediate and delayed recall of the original list
(impaired).  A recognition format did not appreciably
enhance her performance.  Immediate and delayed recall
of visual material were impaired.  Confrontation
naming was impaired for age and educational
background.  Otherwise expressive and receptive
language functions were grossly intact on exam.
Visuospatial and visuoconstructive abilities were
variable (average to impaired).  She had difficulties
on complex working memory/memory tracking tasks, and

5

> sustained and divided attention.  Fine manual
> dexterity was slowed for both right and left hands.
> She endorsed a significant degree of emotional and
> psychological distress on a self-report inventory.

Id. at 774-75.  Dr. Swearer did, however, note that Blackette

"has made remarkable recovery" from her accident, though she has

"residual cognitive deficits in attention, memory, executive

functions, emotional processing, and feelings of depression."

Id. at 775.  She recommended that Blackette commence a course of

cognitive rehabilitative therapy.  Id.

### 4.  Dr. Perlman Evaluation (July 2009)

On July 22, 2009, Blackette was evaluated by Dr. Jon

Perlman, Ed.D., who conducted a residual function evaluation to

determine the presence and extent of her potential disability.

Id. at 460.  He filled out a Social Security Administration Form

SSA-2506-BK, where he indicated that she met Social Security

Disability Listing 12.02 A & B, based on organic mental

disorders and affective disorders.  Id.  Dr. Perlman also

diagnosed her with a depressive disorder not otherwise

specified.  Id. at 463.  He also considered Blackette's

functional limitations, noting that she had moderate restriction

of activities of daily living, but marked difficulties in

maintaining social functioning and maintaining concentration,

persistence, or pace.  Id. at 470.  In his notes section, Dr.

Perlman reported that: "[t]he neuropsychological evaluation on

[November 13, 2007, by Dr. Swearer] showed significant improvement from previous evaluations.  However this most recent neuropsychological evaluation showed continued cognitive deficits in attention, memory, executive functions, emotional processing and depression." Id. at 472.  It is unclear, however, whether Dr. Perlman's reference to "this most recent neuropsychological evaluation" refers to the evaluation he conducted, or to the 2007 evaluation conducted by Dr. Swearer.

## 5.  Dr. Kresser Evaluation (August 2009)

Dr. Perlman's functional finding was reviewed by Dr. Paula Kresser, Ph.D., who concluded that it was not supported by the medical evidence.  See id. at 478-89.  Dr. Kresser first summarized Blackette's self-report on her own functioning, stating that:

> [Blackette] volunteers in a kindergarten, substitute
> teaches, and visits with others.  Claimant takes care
> of her pets.  She indicates that she used to read
> faster, have a better memory, and have a faster
> processing speed.  She wakes up every few hours.  She
> prepares food and does household chores.  She can
> drive and goes out daily.  She shops.  She manages
> money but sometimes needs reminders to finish the job
> and assistance balancing her check book.  She
> socializes in person, online, and by phone.  She can
> only pay attention for 15 minutes.  She does pretty
> well with written instructions but needs extra time to
> process and repetition for spoken instructions.  She
> fears noises and driving fast and anything that
> reminds her of her accident.

Id. at 477.  Dr. Kresser did report that while Blackette

had worked two summers as a camp counselor, "[s]he was

unable to find another job when the summer ended."  Id.

Dr. Kresser then indicated that it was "unclear" to her how

Dr. Perlman had concluded that Blackette had marked difficulties

in social functioning.  Id. at 478.  She noted that Blackette's

"adult functioning report indicates that she socializes on line,

by phone, and in person.  She goes to church and sign language

group.  She gets along with others unless her core values are

challenged."  Id.  Turning to the second "marked difficulty"

area identified by Dr. Perlman, she concluded that:

> [The e]vidence does not indicate[] more than moderate
> limitation with concentration, persistence, or pace at
> least for non complex activities as represented by
> scores of 74 in processing speed.  Although
> [Blackette] has low visual memory scores, it does not
> represent deficits of more than a moderate nature due
> to [Blackette's] ability to compensate with average
> auditory skills.

Id.  Dr. Kresser concluded that Blackette "retains the ability

to perform at least simple, repetitive tasks for a normal work

week and day and to interact appropriately with co-workers and

supervisors."  Id. at 479.

**6.  Dr. Perlman Evaluation (November 2009)**

On November 10, 2009, in response to Dr. Kresser's report,

Dr. Perlman reevaluated his original assessment.  See id. at

488.  He concluded, albeit without explanation, that Blackette's

8

difficulties in maintaining social functioning and in
maintaining concentration, persistence, or pace were only
moderate.  Id. at 498.  He also concluded that her performance
on four measures – (1) understanding and memory, (2) sustained
concentration and persistence, (3) social interaction, and (4)
adaption – was generally not significantly limited, though it
was "moderately limited" in several areas.[2]  Id. at 502-03.  He
concluded by noting that "[t]he most recent neuropsychological
evaluations showed some continued cognitive deficits in
attention, memory, executive functions, and emotional
processing," but that Blackette was "able to perform simple
unskilled work on a sustained basis."  Id. at 504.

### 7.  Dr. Eisenstock Evaluation (March 2010)

Next, on March 11, 2010, Dr. Jordan Eisenstock, a
neuropsychologist, evaluated Blackette.  Id. at 1071, 1075.  He
started with her functional history, and noted that:

> [Blackette] . . .  has difficulty at times with
> comprehension and occasional difficulty with word
> finding.  She has no specific problems with activities
> of daily living.  She has taken and completed a
> driving course and does drive an automobile, but tries
> not to drive any long distances.  She is working as a
> substitute teacher for grades K and up.  She would
> prefer a more regular schedule but is limited by

---

[2] Blackette's ability to understand and remember detailed
instructions was moderately limited, as was her ability to carry
out detailed instructions, to maintain attention and
concentration for extended periods, to complete a normal workday
and workweek without interruption, and to get along with
coworkers or peers without distracting them.  Admin. R. 502-03.

severe fatigue, which has also been present since her
accident.

...

With regards to mood, [Blackette] notes significant
problems with environmental issues surrounding her
situation.  This includes difficulty getting a stable
job, having to live with her parents after college.

Id. at 1071-72.  Medically, Blackette was relatively healthy

neurologically, although she was depressed, for which she took

Zoloft.  See id. at 1072.  Dr. Eisenstock reviewed her recent

psychiatric history, and recommended increasing her dose of

Zoloft and Adderall, and that she continue with psychotherapy.

Id. at 1074.

### 8.    Dr. Davis Evaluation (June 2010)

On June 7, 2010, Dr. P. Davis, Psy.D., reviewed the

existing case material on Blackette, although it does not appear

that he independently examined her.  Id. at 646.  He determined,

based on her self-assessments, that "[s]he's busy planning her

wedding & exercises, shops, socializes, can use a planner, cook,

clean, etc."  Id.  He also stated she was "depressed and

somewhat slow," although "[s]he seems to adequately compensate,

for the most part."  Id.  He concluded by stating that he

affirmed Dr. Perlman's November 2009 finding of no marked

disability.  Id.

### 9.    Dr. Schodlatz Evaluation (June 2011)

Next, on June 10, 2011, Blackette was evaluated by Dr. Diane Schodlatz, Ed.D., a clinical neuropsychologist. Id. at 1027. Schodlatz began her evaluation by discussing Blackette's work and educational history, noting first that she graduated from Gordon College in 2008 with a grade point average of 3.2. Id. at 1028. She then noted Blackette had been working as a substitute teacher, and that she "did not inform the school that she had a traumatic brain injury and no one, other than students, has questioned her performance. Her students have commented on her slow rate of speech and reading." Id.

Dr. Schodlatz reported that, during the session itself, Blackette "was fully cooperative and well motivated," and "[s]he worked steadily for the seven-and-one-half hour session, which included a forty-five minute lunch break." Id. at 1029. Dr. Schodlatz concluded that Blackette had "demonstrated significant improvements or gains in nearly all areas assessed in January 2006," including, inter alia, her (1) verbal comprehension and perceptual reasoning, (2) narrative memory, (3) confrontational naming, (4) visuomotor processing speed, and (5) phonemic fluency. Id. at 1041. "Her visual planning and organization on a task requiring copying a complex geometric figure continued to be mature, configurational, and well organized." Id.

Blackette also "performed well within normal limits on a series of measures that were not administered in January 2006,"

including (1) having no difficulties with cognitive shifting or response inhibition, (2) typical responses to hypothesis testing and concept formation, (3) typical nonverbal creativity, and (4) adequate basic academic skills. Id. Dr. Schodlatz did report problems in terms of (1) visual memory, which "showed little improvement," (2) word finding and speed of mental processing on tasks requiring rapid naming, (3) slowed mental processing speed, as well as self-reported "significant day-to-day difficulties with planning and organization," (4) "striking" difficulties with expressive organization and word retrieval, and (5) reduced self-awareness. Id. at 1042.

### 10. Dr. McCahan Letter (August 2012)

On August 9, 2012, at the request of Blackette's counsel, Dr. John McCahan, Blackette's physician, wrote that she has "difficulty adapting to new situations, translating social feedback such as body language, and has significant difficulty with expressive language." Id. at 1193. As a result, he concluded that "the nature of her injury and her continued cognitive problems make it impossible for [Blackette] to maintain a job with a traditional 5-day workweek." Id.

### 11. Ms. Read Letter (August 2012)

Patricia J. Read, M.A./C.A.G.S., Blackette's vocational rehabilitation counselor since 2011, reported on August 10, 2012, that Blackette "continues to need assistance to help her

plan and organize her routine and environment, multitask as
required in typical employment situations, resist a tendency to
be easily distracted, pay greater attention to detail, initiate
and complete household and financial management tasks, and
manage her time." Id. at 180.  She also provided an update on
Blackette's employment history, stating:

> In the 2011 academic year [Blackette] attempted to
> work as a substitute teacher but encountered
> difficulties that subsequently resulted in her being
> placed on the "do not call" list for all of the
> schools in the district.  In April of this year she
> met with the HR manager when she was given a list of
> reasons for the decision that included difficulties
> with classroom management, concerns about her high
> anxiety level and problems interacting with students.

Id.

## II.  LEGAL STANDARDS

### A.   Standard of Review

Under the Social Security Act, this Court is empowered "to
enter, upon the pleadings and transcript of the record, a
judgment affirming, modifying, or reversing the decision of the
Commissioner of Social Security."  42 U.S.C. § 405(g).  The
Court's role, though, is a narrow one, and its "review is
limited to determining whether the [hearing officer] deployed
the proper legal standards and found facts upon the proper
quantum of evidence."  Nguyen v. Chater, 172 F.3d 31, 35 (1st
Cir. 1999).  Legal questions are reviewed de novo.  Seavey v.
Barnhart, 276 F.3d 1, 9 (1st Cir. 2001).  Findings of fact,

however, "are conclusive when supported by substantial evidence, but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen, 172 F.3d at 35 (internal citations omitted).

Substantial evidence, in turn, must be "more than a mere scintilla. It means such relevant evidence as a reasonable mind must accept as adequate to support a conclusion." Olen v. Colvin, No. 12-12424-JLT, 2014 WL 1912357, at *4 (D. Mass. May 7, 2014) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)) (internal quotation marks omitted). The Commissioner, not the Court, is tasked with "determin[ing] issues of credibility and . . . draw[ing] inferences from the record evidence." Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991). Accordingly, the "resolution of conflicts in the evidence" is done by the agency, not the judiciary. Id. As such, the court must affirm the agency's decision "even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987).

**B. Disability Standard**

An individual is disabled under the Social Security Act if he or she is unable "to engage in any substantial gainful activity by reason of any medically determined physical or

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); see also 20 C.F.R. § 404.1505(a). The impairment must be "of such severity that he [or she] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The agency sets out a five-step process to determine whether an applicant is disabled. See 20 C.F.R. § 404.1520(a)(4). The First Circuit has summarized these steps as follows:

> 1) [I]f the applicant is engaged in substantial gainful work activity, the application is denied; 2) if the applicant does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted; 4) if the applicant's "residual functional capacity" is such that he or she can still perform past relevant work, then the application is denied; 5) if the applicant, given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

Seavey, 276 F.3d at 5 (citing 20 C.F.R. § 416.920). The agency need not proceed through all five steps if the case may be decided according to an earlier step in the process. Id. The

applicant bears the burden of proof on the first four steps, and the agency bears the burden on the last step. McKay v. Colvin, No. 13-10521-PBS, 2014 WL 2957723, at *4 (D. Mass. June 30, 2014) (Saris, C.J.).

## III. THE HEARING OFFICER'S DECISION

In her written findings of fact and conclusions of law, the hearing officer reviewed and then applied the five-step framework discussed above. First, the officer concluded that Blackette has not engaged in substantial gainful activity since the alleged onset date.[3] Admin. R. 19. Turning to the second step, the medical severity of her impairments, 20 C.F.R. § 404.1520(a)(4)(ii); id. § 404.1520(c), the hearing officer determined that Blackette had four severe impairments: post-traumatic brain injury, organic mental disorder, mood disorder, and asthma. Admin. R. 19. This conclusion was based on impairments for which, according to the record medical evidence, Blackette had been diagnosed and treated. Id. at 20.

Next, the hearing officer turned to the third factor, whether Blackette's impairments were sufficiently severe to meet or medically equal the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. Id. She concluded they were not, based

---

[3] The hearing officer did acknowledge that Blackette has worked as a substitute teacher and camp counselor after her injury, but concluded that "the claimant's work activity did not reach substantial gainful activity levels." Admin. R. 19.

on "the record as a whole, as well as that no treating physician has proffered findings that would meet or medically equal the severity required to meet any and all relevant listed impairments both singly and in combination." Id. Specifically, she determined that the governing regulation required her to assess Blackette's functional limitations using the criteria in "paragraph B" of the mental impairment listings, which required that these limitations "must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decomposition, each of extended duration." Id.

The hearing officer considered each category in turn. First, she found that Blackette had a "mild restriction" in activities of daily living, as determined by, inter alia, her social activities, ability to drive, ability to leave the house, and ability to use a computer. Id. The officer did note that Blackette had reported that "completing tasks like doing email or cooking takes her longer to do." Id. Next, the officer determined that Blackette had "mild to moderate difficulties" in social functioning, based mainly on Blackette's subjective testimony and on the fact that she spends time with individuals in person, online, and on the phone, is married, travels, and

participates in certain social groups. Id. at 21. Third, the hearing officer classified Blackette as having "moderate difficulties" with regard to concentration, persistence, or pace. Id. This finding was based on evidence that Blackette has a limited attention span and more limited memory, but that she can "pay attention longer in the morning or if there are no distractions" and that "she finishes what she starts." Id. Fourth, the hearing officer concluded that there was no evidence of decompensation. Id.

The hearing officer then turned to the fourth and fifth steps, where she assessed Blackette's residual functional capacity, and concluded that she had the capacity "to perform light work," though she would "be limited to simple routine tasks, only occasional decision making, occasional changes in the work setting, and occasional interactions with the public." Id. at 22. Here, the hearing officer began by reviewing Blackette's entire medical record in considerable detail. See id. at 22-26. She also considered the "narrative provided by [Blackette]'s mother" and Blackette's testimony before the hearing officer on August 21, 2012. Id. at 26. The hearing officer then made the following findings:

> After careful consideration of the evidence, I find
> that the claimant's medically determinable impairments
> could reasonably be expected to cause the alleged
> symptoms; however, the claimant's statements
> concerning the intensity, persistence and limiting

effects of those symptoms are not credible to the
extent that they are inconsistent with the above
residual functional capacity assessment.

Id. at 27.   The hearing officer concluded that Blackette's

"activities of daily living support a finding of a much higher

residual functional capacity than the claimant alleges," id.,

pointing to evidence that she could finish her college degree

with assistance, travel, drive herself, and look for jobs, id.

at 27-28.   She also noted that the medical evidence has shown

"constant improvement and somewhat conservative treatment," and

that "a number of neuropsychological evaluations found in the

record also support a higher degree of functioning than the

claimant alleges."  Id. at 28.   The officer concluded by finding

Blackette "not fully credible," with the qualification that

"[t]his is not to say that the claimant does not have

limitations in performing tasks," but that "they are not so

limiting that the claimant could not perform work activity at

the level set forth above."  Id.

In support of this finding, she summarized the medical

evaluations she considered.  She said that she gave great weight

to Dr. Perlman's November 2009 opinion, as it is "consistent

with the record as a whole."  Id.  She also stated that Dr.

Perlman's earlier record was "given little weight," because it

was inconsistent with both the "vast majority of the medical

evidence" and Blackette's "activities of daily living."  Id.

The officer also afforded great weight to Dr. Kresser's opinion, mainly on the basis that it is "consistent with the claimant's neuropsychological scores and her activities of daily living." Id. at 29. The hearing officer also gave "some weight" to Dr. Davis's opinion, mainly because the opinion was "consistent with the record as a whole." Id. at 29. The officer gave little weight to two additional opinions. First, she discounted Blackette's mental health counselor, James Valeri, because his opinion was not consistent with her neuropsychological exams, conservative treatment for her depression, and her lack of regular psychotherapy treatment. Id. Second, she discounted the opinion of Dr. McCahan, Blackette's primary care physician, that Blackette could not maintain a five-day workweek job. She based this on two reasons: first, because Dr. McCahan was a pediatrician without expertise in cognitive impairments, and second, because his opinion did not accord with Blackette's neuropsychological testing scores, activities of daily living, and her reports of her own abilities. Id.

Finally, the hearing officer concluded that "the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." Id. at 30. Here, she evaluated Blackette's skills in accordance with the Medical-Vocational Guidelines; she also relied heavily on the findings of a vocational expert who considered that there

were light exertion and unskilled jobs that she could perform, such as a production assembler, photo copy machine operator, or cafeteria attendant.  Id.  Accordingly, she considered that a finding of "not disabled" was proper.  Id.

## IV.  ANALYSIS

Blackette challenges three parts of the hearing officer's ruling: (1) her residual function capacity analysis, (2) her application (or lack thereof) of Social Security Regulation 83-20, and (3) her findings that Blackette's testimony was not fully credible.  See Pl.'s Mem. 10-20.

### A.  Residual Function Capacity Analysis

Blackette focuses the bulk of her argument on the hearing officer's residual function capacity analysis.  While Blackette's briefs are not entirely clear, her core argument appears to be as follows: the hearing officer's residual function capacity ("RFC") determination was based on the RFC evaluation of an expert, Dr. Kresser, which, in turn, was based on out-of-date and slanted data.  It was thus improper for the hearing officer to rely on that report, and accordingly, the officer's RFC determination was itself invalid and must be vacated and remanded.  See Pl.'s Mem. 11-12.  Put differently, this Court must determine whether the raw material upon which an expert based her report was flawed, and if so, whether the

hearing officer's decision, itself based on that report, was thus also fatally flawed.

### 1. Residual Function Capacity Determination Framework

As part of the process of evaluating whether the claimant is disabled, a hearing officer is responsible for making a residual function capacity determination. 20 C.F.R. § 404.1545(a)(1). "In making this determination, the [hearing officer] should consider a claimant's mental health history and the opinions of her doctors." Connolly v. Astrue, No. 11-10798-RGS, 2011 WL 6888645, at *7 (D. Mass. Dec. 30, 2011) (Stearns, J.). Moreover, in developing an evidentiary record necessary to support a residual function capacity determination, "the general rule is that an expert is needed to assess the extent of functional loss." Roberts v. Barnhart, 67 F. App'x 621, 622-23 (1st Cir. 2003) (citing Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 17 (1st Cir. 1996)); see also Rivera-Torres v. Sec'y of Health and Human Servs., 837 F.2d 4, 7 (1st Cir. 1988) (holding that the record must generally include "an [expert's] explanation of claimant's functional capacity," as the agency is "not competent to interpret and apply raw medical data"). The court must uphold these capacity determinations by the agency so long as they are supported by substantial

evidence.[4]  See McDougal v. Astrue, No. 09-40035-FDS, 2010 WL 1379901, at *10 (D. Mass. Mar. 31, 2010) (Saylor, J.).

## 2.  Dr. Kresser Report Timeliness and Consistency

Blackette's first objection is that Dr. Kresser's report, which was completed in August 2009, was sufficiently untimely that it should not have been relied upon by the hearing officer, because it did not address medical evidence gathered between December 2008 and when the hearing officer issued her decision in 2012.  See Pl.'s Mem. 11-12.

As a matter of First Circuit case law, "[i]t can indeed be reversible error for an administrative law judge to rely on an RFC opinion of a non-examining consultant when the consultant has not analyzed the full medical record."  Strout v. Astrue, No. 08-181-B-W, 2009 WL 214576, at *8 (D. Me. Jan. 28, 2009) (citing Rose v. Shalala, 34 F.3d 13, 18 (1st Cir. 1994)).  This is not a per se rule, though.  Instead, a reviewing court must take a more nuanced tack.  If "there is an indication in more recent records that there has been a significant change in the claimant's condition," older medical reports now inconsistent with that evidence may not be used to support an RFC determination.  Abubakar v. Astrue, No. 1:11-cv-10456-DJC, 2012

_____

[4] To clarify the admittedly confusing terminology – medical sources will produce a residual function capacity evaluation, which is then considered by the hearing officer in her residual function capacity determination (or assessment).

23

WL 957623, at *12 (D. Mass. Mar. 21, 2012) (Casper, J.) (citing Soto-Cedeño v. Astrue, 380 F. App'x 1, 2 (1st Cir. 2010)). If, however, the older evidence "remains accurate," it may be relied upon. Id.

This timeliness standard raises two subsidiary questions. First, how consistent must the older report be with newer information? The First Circuit has not spoken directly to this point, but district courts within the circuit do not require a particularly high level of consistency if (1) there are not direct contradictions between the reports, such that the newer evidence is essentially cumulative of the older evidence, or (2) the newer reports show some measure of improvement in the claimant's condition. See, e.g., id. (stating that older reports can be relied upon unless there is a "significant change"); Ferland v. Astrue, No. 11-cv-123-SM, 2011 WL 5199989, at *4 (D.N.H. Oct. 31, 2011) ("[A]n ALJ may rely on such an [RFC assessment] opinion where the medical evidence postdating the reviewer's assessment does not establish any greater limitations, or where the medical reports of claimant's treating providers are arguably consistent with, or at least not 'clearly inconsistent' with, the reviewer's assessment." (internal citation omitted)); Strout, 2009 WL 214576 at *8 (stating that the court could rely on the opinions of doctors who had not seen new medical evidence when those new records "either were

24

cumulative of the records that [experts] did see or, on the whole, reflected improvements in the plaintiff's condition and functionality"); <u>Torres</u> v. <u>Comm'r of Social Sec.</u>, No. 04-2309 (DRD/GAG), 2005 WL 2148321, at *1 (D.P.R. Sept. 6, 2005) (suggesting that RFC assessments of nontreating physicians based on older evidence are acceptable unless they were in "stark disaccord" with other medical evidence); <u>Freese</u> v. <u>Barnhart</u>, No. 03-286-P-S, 2004 WL 1920702, at *4 (D. Me. Aug. 26, 2004) (stating that an RFC assessment can be substantial evidence, even in the "absence of consideration of a complete medical record," if missing records "are merely cumulative").

The second question is whether the court or the agency must make the consistency determination between old and new reports. Here again, the First Circuit has not spoken directly, nor have district courts within the circuit settled on a clear position, though most have implicitly held that the court may so determine. <u>Compare</u> <u>Abubakar</u>, 2012 WL 957623, at *12-13 (court determines consistency), <u>Strout</u>, 2009 WL 214576, at *8 (court determines consistency), <u>and</u> <u>Freese</u>, 2004 WL 1920702, at *4 (court determines consistency), <u>with</u> Ferland, 2011 WL 5199989, at *4 (agency determines consistency). Accordingly, this Court determines that the hearing officer need not make an explicit consistency determination, though, of course, the agency would be advised to do so.

Turning back to the facts of this case, Blackette argues that Dr. Kresser's RFC report fails to consider several key pieces of information which manifested after the report was issued, including: (1) Blackette's involuntary removal from substitute teaching, (2) Blackette's difficulty in managing household affairs, (3) Blackette's driving difficulties, (4) Dr. Schodlatz's 2011 neuropsychological record, and (5) evidence about Blackette's college completion.  Pl.'s Mem. 11-12.

As an initial matter, it first appears that the hearing officer did consider whether Dr. Kresser's report was consistent with other evidence in the record, and she concluded that it was.  See Admin. R. 29 ("As Dr. Kresser's opinion is consistent with the claimant's neuropsychological scores and her activities of daily living, I afford it great weight.").  The question for this Court, then, is whether that conclusion is supportable, i.e., whether the post-dated medical evidence is consistent with or demonstrates an improvement over the earlier reports.

Turning first to Dr. Schodlatz's 2011 report, this evaluation is more positive than the 2006 and 2007 reports which provided the raw material for Dr. Kresser's evaluation.  Dr. Schodlatz concluded that Blackette "demonstrated significant improvements or gains in nearly all areas assessed in January 2006."  Id. at 1041.  Moreover, while Dr. Schodlatz's report indicates that Blackette continues to show weaknesses on certain

neuropsychological measures, these were comparable to those identified in earlier reports. See, e.g., id. at 1042. Turning next to the functional activities,[5] several are relatively straightforward: with respect to driving ability, Dr. Kresser mentioned that Blackette "can drive," id. at 477, a finding confirmed by and consistent with a 2012 driving report, highlighted in Blackette's brief, Pl.'s Mem. 11, which stated that her "basic driving knowledge [and] skill are slightly above average," Admin. R. 183. Turning next to household skills, the 2012 report from Ms. Read, Blackette's vocational rehabilitation counselor, indicated that she needed assistance with household skills, id. at 180, a finding not "clearly inconsistent" with Dr. Kresser's report that Blackette "prepares food and does household chores," id. at 477.

The more complicated issue is the fact that Blackette stopped substitute teaching after Dr. Kresser's report. The Agency argues that "it is not clear from the record that the Plaintiff's reported inability to maintain this job was associated with her cognitive impairments." Def.'s Mem. 12. Such an argument, even if true, is beside the point -- a medical

---

[5] This Court notes that it is unclear whether changes in reports of daily living activities, as opposed to medical reports indicating a change in medical condition, would trigger the application of the "cumulative report" rule discussed in this section. This Court assumes without deciding that it would.

expert, not the hearing officer, is charged with determining the functional limitations caused by such cognitive impairments. Roberts, 67 F. App'x at 622-23. Dr. Kresser, though, based her determination that Blackette did not suffer "marked difficulties in social functioning" on the fact that "she socializes on line, by phone, and in person. She goes to church and sign language group. She gets along with others unless her core values are challenged. She is less out going than she used to be and participates less in large groups." Admin. R. 478. Kresser does not appear to have based this determination on anything related to Blackette's ability to teach. Accordingly, given the relatively deferential standard of "arguably consistent" or "not clearly inconsistent," this Court concludes that that such changed circumstances are not so stark as to warrant reversal.

This conclusion is especially true in light of the fact that the medical expert opinions all essentially accord with one another. The First Circuit is clear that "[i]t is common ground that an ALJ is not free to substitute his own judgment for uncontroverted medical opinion." Rose, 34 F.3d at 18; see also Dube v. Barnhart, No. 06-20-P-C, 2006 WL 2822370, at *2 (D. Me. Sept. 29, 2006)("[T]he plaintiff asks this court to invalidate the commissioner's conclusion based on the plaintiff's own lay evaluation of [a doctor's] findings, in the face of contrary findings in [a different expert]'s report. Under these

circumstances, this court cannot do what the administrative law judge could not do. The administrative law judge was entitled to rely on [the second expert]'s findings, particularly in the absence of any contrary medical evidence."). Here, there are simply no other medical opinions in evidence that contradict Dr. Kresser's report, which counsels in favor of determining that the report is current.

### 3. Report Adequacy

Next, Blackette argues that even if Dr. Kresser's report is not untimely, it is substantively inadequate to support the hearing officer's residual functional capacity assessment. <u>See</u> Pls.' Mem. 12-16. Blackette makes two specific objections: (1) Dr. Kresser lacked current information on Blackette's activities when writing her report, <u>id.</u> at 13, and (2) Dr. Kresser did not properly summarize earlier neuropsychological examinations conducted by other specialists, <u>id.</u> at 13-14.

The standard for expert report adequacy is quite permissive. The First Circuit has clarified that nonexamining medical expert reports, like the ones used in this case, can, standing alone, serve as substantial evidence in support of a residual functional capacity assessment. <u>See</u> <u>Berrios Lopez</u> v. <u>Sec'y of Health & Human Servs.</u>, 951 F.2d 427, 431 (1st Cir. 1991). The key is how detailed the reports themselves are: those that "contain little more than brief conclusory statements

or the mere checking of boxes denoting levels of residual
capacity . . . are entitled to relatively little weight," id.,
while those that "supported their conclusions with reference to
medical findings" ought be given more credit, Quintana v. Comm'r
of Social Sec., 110 F. App'x 142, 144 (1st Cir. 2004); see also
Morin v. Astrue, No. 10-cv-159-JL, 2011 WL 2200758, at *3
(D.N.H. June 6, 2011) ("[T]he ALJ's decision to adopt an
assessment by a non-treating physician is further supported if
that assessment references specific medical findings indicating
that the claimant's file was reviewed with care."). Reliance on
the report is further warranted when the expert report is not
the sole basis for the hearing officer's RFC determination. See
Morin, 2011 WL 2200758, at *6 (holding that agency was justified
in adopting expert RFC opinions when "the ALJ formulated his RFC
based on a review of all the evidence and then adopted the state
agency doctor's opinions after determining that they 'are not
inconsistent with the other substantial evidence in the
record'").

Turning back to the facts of the case, Dr. Kresser's report
meets the Berrios Lopez standard. First, it is far more
detailed than the "check the box" style of report writing that
the First Circuit has criticized, Berrios Lopez, 951 F.2d at
431, but is rather a multi-page, narrative analysis that engages
with the relevant medical evidence. See, e.g., Admin. R. 478

("Evidence does not indicate[] more than moderate limitation with concentration, persistence, or pace at least for non complex activities as represented by scores of 74 in processing speed. Although claimant has low visual memory scores, it does not represent deficits of more than a moderate nature due to claimant's ability to compensate with average auditory skills."). Stated simply, Dr. Kresser provides evidence – in the form of neuropsychological assessments and self-reported functional information – that supports her conclusion, as is required by the First Circuit. See Ormon v. Astrue, 497 F. App'x 81, 84 (1st Cir. 2012) (per curiam). Second, the hearing officer did not rely exclusively on Dr. Kresser's report, but rather considered it in conjunction with other evidence in the record, Admin. R. 28-29, an analytical decision which further justifies reliance on the report. See Morin, 2011 WL 2200758, at *6-7.

Nor do Blackette's specific objections justify remand. With respect to the criticism that Dr. Kresser's report lacked information on Blackette's current medical history at the time of writing, Dr. Kresser referenced medical evidence that was only one month old at the time the report was written. See Admin. R. 477 (referencing form dated July 22, 2009, in a report dated August 26, 2009). Moreover, the First Circuit has explicitly blessed the use of nonexamining, nontestifying

consultants, see Quintana, 110 F. App'x at 144, and such
consultants must necessarily and definitionally rely on
noncurrent information in making their determinations.
Accordingly, the use of slightly dated information cannot be a
per se cause for remand.

Second, Blackette argues that Dr. Kresser inadequately
summarized previous neuropsychological examinations, and did not
include information on the degrees of accommodation that
Blackette required.  See Pls.' Mem. at 13-14.  Blackette points
to no case law indicating that an expert report must be rejected
if it does not summarize every detail of the raw medical data
upon which it is based, nor can this Court find a case standing
for such a proposition.  Blackette's objection, it seems, goes
more to the weight and credibility that the hearing officer paid
to these reports, which is a judgment committed to the hearing
officer so long as there is, as here, evidence which could be
"adequate to support h[er] conclusion."  Rodriguez v. Sec'y of
Health & Human Servs., 647 F.2d 218, 222-23 (1st Cir. 1981).

### 4.   Consideration of Reasonable Accommodations

Next, Blackette argues that the hearing officer did not
properly account for Blackette's "need for accommodation for
[her] disability," Pl.'s Reply 2, under the Americans with
Disabilities Act ("ADA") in conducting her RFC.

Blackette correctly notes that "when the [Social Security Agency] determines whether an individual is disabled for [Social Security Disability Insurance] purposes, it does <u>not</u> take the possibility of 'reasonable accommodation' into account, nor need an applicant refer to the possibility of reasonable accommodation when she applies for [Social Security Disability Insurance]." <u>Cleveland</u> v. <u>Policy Mgmt. Sys. Corp.</u>, 526 U.S. 795, 803 (1999). She argues that the hearing officer, when making her RFC determination, improperly considered Blackette's capacity <u>with</u> the benefit of accommodation, and thus remand is warranted.[6]

As an initial matter, this Court notes that <u>Cleveland</u> is formally inapposite. In that decision, the Supreme Court clarified that the Social Security agency could not "take the possibility of 'reasonable accommodation' into account" when determining disability. <u>Id.</u> Such language is most naturally read to mean that the agency cannot consider the possibility that a claimant will receive an accommodation in determining whether they would be able hold a job (i.e., the hearing officer could not say "this claimant would be disabled unless she received a reasonable accommodation, but I will assume she will receive such an accommodation"). See <u>Henriquez</u> v. <u>Astrue</u>, 482

---

[6] It does not appear from the record that Blackette has received formal accommodation through an ADA-driven process. Rather, the more proper term would likely be "assistance."

F. Supp. 2d 50, 59 (D. Mass. 2007) (Neiman, M.J.) (stating that
the hearing officer must make "no assumption that [claimant's]
[future] employer would accommodate her impairments"). In this
case, the hearing officer did not make such a determination.

This Court reads Blackette's argument as one that is subtly
different: she argues that the hearing officer did not properly
account for the degree to which she was given accommodation (or
assistance) in her activities of daily living when determining
her residual functioning. Said differently, instead of
prospectively assuming that Blackette would get assistance in
the future, as would be forbidden under Cleveland, the hearing
officer, under this argument, failed to consider that Blackette
had retrospectively received accommodation. Neither party cites
case law explicating this specific issue.

Even so, the factual proposition underlying Blackette's
argument appears flawed, as the hearing officer did recognize
that Blackette received help. Turning to the opinion, the
hearing officer recognized and considered the fact that
Blackette received accommodation in completing school. See
Admin. R. 26 ("She testified that her husband was really
supportive after her injury, and that when she was still in
college, she was given some accommodations including notes,
deadline extensions and testing in a quiet room for a longer
period of time. When asked if she could finish school without

34

the accommodations, the claimant said she could not."); id. at

27 (noting that Blackette "was able to finish her college degree

(with assistance with classes and longer time for exams)").  The

closer question is whether the hearing officer recognized that

Blackette received help for household activities.  Here, the

evidence is equivocal – for some activities, the hearing officer

did consider assistance, for some, she may not have.  The

hearing officer notes that Blackette did receive some

assistance, especially with memory issues.  See id. at 26-27

("The claimant also remarked that she has memory problems, and

needs reminders to keep appointments.").  The officer also

focused, however, on the types of activities Blackette was able

to do independently (i.e., without assistance), noting that she

could "work at a summer camp, and work as a substitute teacher,

plan her wedding, regularly exercise, and maintain a household."

Id. at 27.  Such statements generally accord with Blackette's

own testimony.  See, e.g., id. at 1244-48 (describing activities

of daily life).

    These statements do not, however, fully accord with the

testimony of Blackette's vocational rehabilitation counselor,

who noted that Blackette was to receive "intensive in-home

support to improve her organizational strategies and ability to

complete simple tasks such as dishwashing and food preparation."

Id. at 180.  (This Court does note that the statements are not

entirely inconsistent – Blackette could have an ability to maintain a household, while still benefiting from resources that would help her better manage or maintain that household.) The hearing officer did not mention this counselor, and thus does not explicitly consider this type of assistance, though she did state that she based her decision "on the record as a whole," which implies implicit consideration. Id. at 29.

The question is: is that enough? Again, there is little case law on this issue. Relevant, though, is Judge Saylor's decision in Santiago ex rel. V.S. v. Astrue, No. 08-40248-FDS, 2010 WL 1379836 (D. Mass. Mar. 31, 2010) (Saylor, J.). There, in the context of social security benefits for children, which is a somewhat different statutory scheme, Judge Saylor held that the hearing officer "erred by failing to consider . . . accommodations" provided by the child's school, as required by the governing regulation. Id. at *10-12. Judge Saylor did recognize that implicit consideration could be sufficient, but there was insufficient evidence of such implicit consideration in that case. See id. at *11. This Court recognizes, however, that this decision is only somewhat useful here: Santiago addressed a specific regulatory context not relevant to this case, and that decision held that there was not even implicit consideration of accommodation, whereas in Blackette's case there was explicit consideration of accommodation across several

factors, just not of _every_ example of accommodation in the
record.

This Court must then turn to more general principles. The
case law is clear that a hearing officer "need not explicitly
refer to every piece of evidence in [her] decision," Martinez
ex rel. J.R.M. v. Astrue, No. 11-30258-KPN, 2012 WL 2914427, at
*4 (D. Mass. June 25, 2012) (Neiman, M.J.), "so long as [her]
factual findings as a whole show that [she] 'implicitly
resolve[d]'" such findings, NLRB v. Beverly Enters.-Mass., Inc.,
174 F.3d 13, 26 (1st Cir. 1999) (alteration in original)
(quoting NLRB v. Berger Transfer & Storage Co., 678 F.2d 679,
687 (7th Cir. 1982)). Moreover, the decision itself is subject
to the "substantial evidence" standard, which requires
affirmation "if a reasonable mind, reviewing the evidence in the
record as a whole, could accept it as adequate to support [the
hearing officer's] conclusion." Pires v. Colvin, No. 12-10327-
GAO, 2014 WL 1051206, at *3 (D. Mass. Mar. 18, 2014) (O'Toole,
J.) (quoting Irlanda Ortiz, 955 F.2d at 769) (internal quotation
marks omitted).

Accordingly, this Court recognizes that the hearing officer
would have been well served by explicitly considering the
testimony of Blackette's vocational rehabilitation counselor.
Even so, this Court holds that – given the lack of an explicit
legal requirement for the agency to consider all examples of

assistance – the explicit consideration of many examples of assistance that Blackette received, the fact that types of assistance not explicitly considered are not necessarily inconsistent with evidence that was explicitly discussed, and the fact that, looking at the record as a whole and especially at Blackette's own testimony, a reasonable mind could accept the hearing officer's conclusion, the hearing officer's decisions do not justify remand on this ground.

### B. Social Security Regulation 83-20

Next, Blackette argues that the hearing officer was obligated to obtain a medical expert under Social Security Regulation 83-20, Titles II & XVI: Onset of Disability ("SSR 83-20), 1983 WL 31249, to determine when she was disabled. See Pl.'s Mem. 16-17. This argument fails.

SSR 83-20 requires that "[i]n addition to determining that an individual is disabled, the decisionmaker must also establish the onset date of disability." SSR 83-20, 1983 WL 31249, at *1. If the date of disability is not obvious from the record, and thus must be inferred, the hearing officer "should call on the services of a medical adviser." Id. at *3.

Here, however, the hearing officer ruled that Blackette was not disabled. Admin. R. 31. Accordingly, SSR 83-20, which by its plain text only applies after the hearing officer "determin[es] that an individual is disabled," is inapplicable.

SSR 83-20, 1983 WL 31249, at *1. Arguing against this reading, Blackette highlights two cases from within the Circuit, Ryan v. Astrue, No. 08-cv-17-PB, 2008 WL 3925081 (D.N.H. Aug. 21, 2008), and Bica v. Astrue, No. 09-cv-014-SM, 2009 WL 3756894 (D.N.H. Nov. 9, 2009), and argues that they stand for the proposition that these cases require the agency to make a date-of-disability determination notwithstanding a no-disability ruling. See Pl.'s Mem. 17. These cases do not stand for such a proposition. Rather, they hold that an agency cannot "skip[] over the question of present disability" and deny a benefits claim "by determining that the claimant was not disabled as of her date last insured." Ryan, 2008 WL 3925081, at *7. If the agency has determined that the applicant is not disabled, the regulation does not apply. See Bica, 2009 WL 3756894, at *4 ("[T]he ALJ had an obligation first to address the issue of present disability and then, if necessary, establish the onset date."). Accordingly, SSR 83-20 is wholly inapplicable to Blackette's case, and her argument on this point must be rejected.

### C. Credibility Explanation

Finally, Blackette argues that the hearing officer's determination that Blackette was not fully credible was not "legally sufficient." See Pl.'s Mem. 17-20.

As a prerequisite matter, "[i]ssues of credibility and the drawing of permissible inference from evidentiary facts are the

prime responsibility of the [agency]." Rodriguez, 647 F.2d at 222 (alteration in original) (quoting Rodriguez v. Celebrezze, 349 F.2d 494, 496 (1st Cir. 1965)) (internal quotation marks omitted).  A credibility determination by the hearing officer "who observed the claimant, evaluated [her] demeanor, and considered how that testimony fit in with the rest of the evidence, is entitled to deference, especially when supported by specific findings." Simumba v. Colvin, No. 12-30180-DJC, 2014 WL 1032609, at *10 (D. Mass. Mar. 17, 2014) (Casper, J.) (alteration in original) (quoting Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987)) (internal quotation marks omitted).  Such determinations, however, "must be supported by substantial evidence[,] and the ALJ must make specific findings as to the relevant evidence he considered in determining to disbelieve the claimant." Id. (alteration in original) (quoting Carr v. Astrue, No. 09-cv-10502-NG, 2010 WL 3895189, at *6 (D. Mass. Sept. 30, 2010) (Gertner, J.)) (internal quotation marks omitted).

In this case, the hearing officer had the chance to observe Blackette in person, and she concluded that Blackette's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not credible to the extent they are inconsistent with the above residual functional capacity

40

assessment."  Admin. R. 27.  She supported this assessment as

follows:

> The claimant's activities of daily living support a
> finding of a much higher residual functional capacity
> than the claimant alleges. For example, following the
> claimant's injury, she was able to finish her college
> degree (with assistance with classes and longer time
> for exams), work at a summer camp, and work as a
> substitute teacher, plan her wedding, regularly
> exercise, and maintain a household.  The claimant has
> also gone on trips to Hawaii and Israel after her
> accident.  At the hearing, as noted above, the
> claimant also testified that she can drive herself,
> she goes on the computer, looks for jobs, emails,
> plays games, goes shopping and takes public
> transportation.  . . . The medical records outlined
> above clearly demonstrate that the claimant for the
> most part receives routine and conservative treatment;
> when the claimant first had her accident, she was
> subjected to a series of surgeries, however, after her
> successful surgeries, she has shown constant
> improvement and somewhat conservative treatment.

Id. at 27-28.  She also discussed the RFC reports of Drs.

Kresser, Perlman, and Davis, as discussed earlier.  See id. at

28-29.

This discussion, which includes specific references to

medical determinations and specific examples of the claimant's

own self-reported activities of daily living, is the type of

"specific findings as to relevant evidence" that are required

under the statute.

In response, Blackette criticizes the hearing officer's

recitation of Blackette's ability to perform chores and other

household activities.  See Pl.'s Mem. 17-18.  While Blackette is

correct that such activities cannot, by themselves, demonstrate an ability to work, they can be used – as the hearing officer used them here – for credibility determinations. Teixeira v. Astrue, 755 F. Supp. 2d 340, 347 (D. Mass. 2010) ("While a claimant's performance of household chores or the like ought not be equated to an ability to participate effectively in the workforce, evidence of daily activities can be used to support a negative credibility finding."); see also Jette v. Astrue, No. 07-437A, 2008 WL 4568100, at *16 (D.R.I. Oct. 14, 2008) (stating that the hearing officer may consider whether activities of daily life are consistent with allegations of disability).

Next, Blackette points to the fact that her primary care physician and therapist opined that she "could not perform all of the functions of a job." Pl.'s Mem. 19. The hearing officer considered these sources, however, and gave them little weight, mainly because they did not align with the available objective medical evidence, were not acceptable medical sources (in the case of her therapist) or were outside of their area of specialty (in the case of her physician), and because they contradicted Blackette's "own activities of daily living and her reports of her own abilities." Admin. R. 29. This she may do if supported by substantial evidence, which may include medical evidence – such as expert reports – inconsistent with such treating source reports. See, e.g., Amaral v. Comm'r of Social

Sec., 797 F. Supp. 2d 154, 162-63 (D. Mass. 2010); Tompkins v. Colvin, No. 1:13-CV-73-GZS, 2014 WL 294474, at *4 (D.R.I. Jan. 27, 2014) (stating that treating source report can be rejected if hearing officer gives "supportable reasons for rejecting it"). Such reasons are sufficiently substantial for these purposes.

In essence, Blackette provides an alternate interpretation of her symptoms – one where she struggles to work, but cannot do so, despite her best efforts. Were it to interpret this evidence anew, this Court may well adopt this view. Under the relevant framework, though, this Court must affirm the agency decision if supported by substantial evidence, "even if the record arguably could justify a different conclusion." Tsarelka v. Sec'y of Health & Human Servs., 842 F.2d 529, 535 (1st Cir. 1988). So it is here.

## V.    CONCLUSION

For the aforementioned reasons, Blackette's motion to remand, ECF No. 13, is DENIED, and the Agency's motion for an order affirming the decision of the Commissioner, ECF No. 25, is GRANTED.

**SO ORDERED.**

_/s/ William G. Young__
WILLIAM G. YOUNG
DISTRICT JUDGE